1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DON BLYTHE, an individual,<br><br>                                    Plaintiff,<br><br>v.<br><br>CITY OF SAN DIEGO,<br><br>                                  Defendant. | Case No.:  24-cv-02211-GPC-DDL<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS**<br><br>**[ECF No. 20]** |

## INTRODUCTION

Plaintiff Don Blythe challenges the constitutionality of City of San Diego Ordinance O-21822 ("the Ordinance"), which regulates certain types of speech within 100 feet of health care facilities, places of worship, and school grounds (the "Covered Facilities").  ECF No. 18 ("FAC") ¶¶ 26; *see* ECF No. 20-2 at 21–48 (the Ordinance). Within this radius, the Ordinance prohibits individuals from "knowingly and willfully approach[ing] within eight feet of a person in the public right-of-way or sidewalk area seeking to enter or exit a health care facility, place of worship, or school grounds" to pass leaflets, display signs, or engage in oral protest, education, or counseling, unless the individual first obtains consent.  FAC ¶ 26.

1

The City of San Diego (the "City") closely modeled the Ordinance after an ordinance the Supreme Court upheld in *Hill v. Colorado*, 530 U.S. 703 (2000).  While the language regulating speech is identical, the Ordinance here includes places of worship and school grounds, while the ordinance in *Hill* applied only to health care facilities.  *Id.* at 707.  The essence of Plaintiff's challenge is that the City's inclusion of places of worship and, particularly, school grounds places this Ordinance outside of what is constitutionally permissible.

On November 25, 2024, Plaintiff Don Blythe sued the City of San Diego.  ECF No. 1 ("Compl.").  After the Court denied Plaintiff's motion for a preliminary injunction, ECF No. 17, Plaintiff filed the FAC on January 27, 2025, claiming that the Ordinance violates his free speech rights under the First Amendment of the United States Constitution, on its face and as applied, and that the Ordinance is unconstitutionally vague and overbroad.  FAC ¶¶ 32–40.  Currently before the Court is Defendant's motion to dismiss the FAC.  ECF No. 20.  Defendant opposed the motion, ECF No. 24, and Plaintiff replied, ECF No. 25.  On May 2, 2025, the Court held a hearing on the motion.  ECF No. 26.  Having considered the papers on file in this matter and the parties' arguments at the hearing, the Court grants in part and denies in part the City's motion to dismiss for the reasons below.

## BACKGROUND

On January 27, 2025, Plaintiff filed the FAC against the City of San Diego (the "City"), challenging City of San Diego Ordinance O-21822 (the "Ordinance") as unconstitutional.  *See generally* FAC.  The Ordinance, which the City enacted on June 11, 2024, *id.* ¶ 22; ECF No. 20-2 at 22, reads in relevant part:

> (c)  Consent Required.  Within a radius of 100 feet of a *health care facility*, *place of worship*, or *school grounds*, unless the person or motor vehicle occupant *consents*, no person shall:

(1) knowingly and willfully approach within eight feet of a person in the public right-of-way or sidewalk area who is seeking to enter or exit a *health care facility*, *place of worship*, or *school grounds*, to:

(i) pass a leaflet or handbill to that person;

(ii) display a sign to that person;

(iii) engage in oral protest, education, or counseling.

FAC ¶ 26; ECF No. 20-2 at 27–28. Plaintiff claims that the Ordinance "prohibits constitutionally protected speech and assembly on public streets and sidewalks." FAC ¶ 2. More specifically, Plaintiff argues that the Ordinance, on its face and as applied to him, violates the First and Fourteenth Amendments to the United States Constitution because it violates his Free Speech rights and is unconstitutionally vague and overbroad. *Id.* ¶¶ 31–40.

The Ordinance recognizes a "constitutional right to privacy in accessing healthcare, including reproductive healthcare, to exercise religion, and to access equal educational opportunities, and that intentional efforts to harass or prevent a person from exercising these rights are contrary to the interests of the people of San Diego." ECF No. 20-2 at 24. Accordingly, the City's stated purpose for passing the Ordinance is "to strike a balance between protecting the rights of those who seek access to healthcare, to practice their religion, and access educational services, while also protecting the rights of those who wish to express themselves." *Id.* In support of this purpose, the Ordinance states that "demonstration activities around Covered Facilities have subjected students, teachers, [and] parents . . . to harassment and abuse from people who attempt to block entrances and exits to Covered Facilities and parking lots used to access these locations." *Id.* at 23. The Ordinance further states that "aggressive demonstration activities pose significant public safety threats" and that "places of worship and schools are increasingly exposed to demonstration activities." *Id.* The legislature also considered the City Attorney's staff report on the Ordinance, which provided the City with evidence that

3

there may be an uptick in aggressive demonstration activities near Covered Facilities in San Diego. *See id.* at 49–54. Plaintiff adamantly disputes the veracity of the evidence the City relied upon in passing the Ordinance. FAC ¶¶ 10–21.

Plaintiff, "[m]otivated by his moral, religious, and political beliefs, . . . regularly engages in pro-life, anti-abortion speech activities in California." FAC ¶ 4. Plaintiff's activities "include hand-to-hand leafleting, education about abortion, and holding signs with a pro-life, anti-abortion message." *Id.* Above all, however, Plaintiff "seeks to display and distribute written information and engage in thoughtful discussions with college and high school students" dozens of times each year. *Id.* Plaintiff intends to engage in these activities near high schools in the City of San Diego. *Id.* ¶¶ 27–29. Plaintiff alleges that he, alongside others, intends to come within eight feet of students as they leave school grounds to pass leaflets. *Id.* ¶ 28. However, Plaintiff alleges that "[o]btaining consent is an unrealistic requirement for distributing literature to multiple people arriving in waves," *id.* ¶ 30, and he is therefore concerned that he will be arrested for violating the Ordinance if he engages in his intended activities, *id.* Because of these concerns, Plaintiff is currently refraining from engaging in these activities, but "is and has been ready, willing, and able to engage in" the activities. *Id.*

On November 25, 2024, Plaintiff brought the instant lawsuit against the City. *See generally* Compl. On December 13, 2024, Plaintiff filed a motion for a preliminary injunction, seeking to enjoin enforcement of the Ordinance. ECF No. 9-1 at 1-2. On January 14, 2025, the Court denied issuance of a preliminary injunction in large part because the Supreme Court's opinion in *Hill*, 530 U.S. at 703, controlled the presented legal issues, and therefore Plaintiff could not show a likelihood of success on the merits. ECF No. 17. On January 27, 2025, Plaintiff filed the FAC. *See generally* FAC. On February 10, 2025, the City filed a motion to dismiss the FAC, which is now before the Court. ECF No. 20.

## REQUEST FOR JUDICIAL NOTICE

The City requests that the Court take judicial notice of the following exhibits: (A) City of San Diego Ordinance O-17897; (B) City of San Diego Ordinance O-18452; (C) City of San Diego Ordinance O-21822;[1] and (D) a City Attorney Staff Report regarding the Ordinance at issue in this case.  ECF No. 20-2.  Under Federal Rule of Evidence 201, a Court may take judicial notice of facts that are not subject to reasonable dispute because they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2).

As the Court acknowledged in its Order denying Plaintiff's motion for a preliminary injunction, ECF No. 17 at 3 n.1; *Blythe v. City of San Diego*, No. 24-cv-02211-GPC-DDL, 2025 WL 108185, at *1 n.1 (S.D. Cal. Jan. 14, 2025), "[m]unicipal ordinances are proper subjects for judicial notice." *Tollis, Inc. v. County of San Diego*, 505 F.3d 935, 938 n.1 (9th Cir. 2007); *see also Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1025 n.1 (9th Cir. 2009) (taking judicial notice of a city ordinance); *Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1025 n.2 (9th Cir. 2006) (same).  The Court further took judicial notice of the staff report in that same Order, ECF No. 17 at 10 n.3; *Blythe*, 2025 WL 108185, at *4 n.3, because such legislative reports are proper subjects of judicial notice.  *See San Diego Cnty. Lodging Association v. City of San Diego*, 561 F. Supp. 3d 960, 964 n.3 (S.D. Cal. 2021) (taking judicial notice of staff report to San Diego City Council); *Comm. to Protect our Agric. Water v. Occidental Oil & Gas Corp.*, 235 F. Supp. 3d 1132, 1152 (E.D. Cal. 2017) (taking judicial notice of staff report on revisions to a county ordinance).

---

[1] Exhibits A and B are earlier versions of Exhibit C, which is the Ordinance at issue in this lawsuit.  *See* ECF No. 20-2 at 4–48.

24-cv-02211-GPC-DDL

However, Plaintiff now opposes judicial notice of all four exhibits "to the extent … that encompasses judicial notice of any purported 'facts' stated therein."  ECF No. 24 at 9.  Plaintiff argues that "[t]he description, characterization, and effects of past demonstration activity in San Diego and elsewhere" are not the proper subjects of judicial notice. *Id.*  However, the Court need not take these facts into consideration in deciding the motion to dismiss.  The relevance of the evidence the City relied upon in passing the Ordinance is the fact that the City relied on it in reaching its legislative decision, not whether it should be taken as true.  Accordingly, the Court will take judicial notice of the City's proffered exhibits, but only for their existence and their contents, and not the truth of the facts therein.  In particular, the Court will consider the City's rationales for applying the Ordinance, but not whether the underlying factual bases for the rationales are true. *See Bd. of Trs. of Leland Stanford Junior Univ. v. County of Santa Clara*, No. 18-cv-07650-BLF, 2019 WL 5087593, at *4 (N.D. Cal. Oct. 10, 2019) (taking judicial notice of a staff report and other legislative documents proffered "to demonstrate the plausibility of several rationales for applying the Ordinance," but only for their existence and contents, and not for the truth of the facts asserted therein); *see also Lee v. City of L.A.*, 250 F.3d 668, 688 (9th Cir. 2001) (holding that a court may take judicial notice of "*undisputed* matters of public record," but not any disputed facts therein) (emphasis in original), *overruled on other grounds by Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1125–26 (9th Cir. 2002)).

## LEGAL STANDARDS

Federal Rule of Civil Procedure ("Rule") 12(b)(6) permits dismissal for "failure to state a claim upon which relief can be granted."  Dismissal under Rule 12(b)(6) is appropriate where the complaint fails to state a cognizable legal theory or allege sufficient facts to support a cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

When reviewing a Rule 12(b)(6) motion, the court accepts all facts alleged in the complaint as true and draws all reasonable inferences in favor of the non-moving party. *Chubb Custom Inc. v. Space Sys./Loral, Inc.*, 710 F.3d 946, 956 (9th Cir. 2013). Although the general rule prohibits a district court from considering evidence outside the pleadings in reviewing a motion to dismiss, it may properly consider "documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice[.]" *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

## DISCUSSION

### I.     Scope of Plaintiff's First Amendment Challenge

The classification of a challenge "as facial or as-applied affects the extent to which the invalidity of the challenged law must be demonstrated and the corresponding 'breadth of the remedy.'" *Bucklew v. Precythe*, 587 U.S. 119, 138 (2019) (citation omitted). "An as-applied challenge contends that the law is unconstitutional as applied to the litigant's particular speech activity, even though the law may be capable of valid application to others." *Foti v. City of Menlo Park*, 146 F.3d 629, 635(1998) (citing *Members of the City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 803 & n.22 (1984)). On the other hand, a facial First Amendment challenge seeks to strike down a law in its entirety, and a plaintiff must show that "a substantial number of [the law's] applications are

unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024).

The label Plaintiff affixes to his claim is not what matters, *Doe v. Reed*, 561 U.S. 186, 194 (2010), because "[t]he line between facial and as-applied challenges can sometimes prove 'amorphous,' … and 'not so well-defined,'" *Bucklew*, 587 U.S. at 139 (citations omitted). "Instead, '[t]he important point' for identifying the nature of a challenge is whether a plaintiff's 'claim and the relief that would follow … reach beyond the particular circumstances' of that plaintiff." *Project Veritas v. Schmidt*, 125 F.4th 929, 940 (9th Cir. 2025) (en banc) (quoting *Doe v. Reed*, 561 U.S. at 194).

Here, Plaintiff makes a facial and as-applied challenge. But the parties dispute whether Plaintiff has adequately pleaded an as-applied challenge to the Ordinance. ECF No. 20-1 at 19–20; ECF No. 24 at 24–25. In his Complaint, Plaintiff seeks a declaratory judgment that the Ordinance is unconstitutional as applied to his activity. FAC at 8. Plaintiff specifically alleges that he "often seeks to display and distribute written information and engage in thoughtful discussion with" students near high schools. *Id.* ¶¶ 4, 27. Plaintiff's intended activities include "hand-to-hand leafleting, education about abortion, and holding signs with a pro-life, anti-abortion message." *Id.* ¶ 4. He intends to engage in these activities near two specific exits outside Patrick Henry High School as students leave the school grounds for the day. *Id.* ¶ 28. Plaintiff argues that because this timing involves hundreds of students leaving school grounds during a short period of time, the consent requirement leaves him without viable alternatives. ECF No. 24 at 25. Plaintiff contrasts his circumstances with attempts to leaflet outside of health care facilities, where patients tend to either arrive alone or with a companion and arrive in much smaller waves. *Id.*

The Court finds these allegations sufficient to raise an as-applied challenge to the Ordinance. Plaintiff intends on passing pro-life, anti-abortion leaflets at a specific time

outside of a specific high school. He claims that the Ordinance, as applied to these specific circumstances, creates an insurmountable barrier to engaging in these activities. These allegations are even more specific than those in *Project Veritas*, where the plaintiffs generally intended to both secretly and openly record conversations with government officials, law enforcement officers, and protestors, as well as encounters between the latter two groups. 125 F.4th at 940. The Ninth Circuit found that these allegations of specific conduct raised an as-applied challenge. *Id.* at 940–41. Similarly, here, the Court construes the FAC as raising both a facial and as-applied challenge.

## II. As-Applied Free Speech Challenge

The Court first addresses Plaintiff's as-applied free speech challenge. "The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits the enactment of laws 'abridging the freedom of speech.'" *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (citing U.S. Const., Amend. 1). Content based regulations of speech "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* For instance, laws are content based if they "target speech based on its communicative content," *id.*, or "single[] out particular content for differential treatment," *Berger v. City of Seattle*, 569 F.3d 1029, 1051 (9th Cir. 2009) (en banc).

A content neutral regulation, on the other hand, is valid if it is a "reasonable time, place, and manner restriction[] on speech." *A.C.L.U. of Nev. v. City of Las Vegas*, 466 F.3d 784 (9th Cir. 2006); *McCullen v. Coakley*, 573 U.S. 464, 477 (2014) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). Such regulations must survive intermediate scrutiny. *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61 (2022). Under intermediate scrutiny, content neutral regulations must be "narrowly

tailored to serve a significant governmental interest" and "leave open ample alternative channels for communication of the information." *McCullen*, 573 U.S. at 477 (quoting *Ward*, 491 U.S. at 791).

The Court will first consider whether the Ordinance is content based, and then it will consider whether the Ordinance survives the applicable level of scrutiny.

**A. Content Neutrality**

The Court must first determine whether the Ordinance is content based or content neutral. Plaintiff argues that holding the Ordinance to be content neutral would be an impermissible extension of the Supreme Court's decision in *Hill v. Colorado*, 530 U.S. at 703, and would be in friction with the Supreme Court's other relevant First Amendment cases. ECF No. 24 at 10–13. The City maintains that the Ordinance is content neutral because it merely makes a distinction between broad categories of speech and does not distinguish based on the subject matter of the speech. ECF No. 20-1 at 8–10. Therefore, the City argues, *Hill* controls here. *Id.* at 9–10.

At the heart of this issue is the Supreme Court's decision in *Hill v. Colorado*, 530 U.S. at 703. There, the Court considered a nearly identical ordinance which made it unlawful within 100 feet of the entrance to a health care facility to "'knowingly approach' within eight feet of another person, without that person's consent, 'for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling with such other person[.]"[2] *Id.* at 707. The plaintiffs, "sidewalk counselors" who engaged in "efforts to educate, counsel, persuade, or inform passersby about abortion and abortion alternatives by means of verbal or written speech,"

---

[2] The only material difference between the ordinance at issue in *Hill* and the Ordinance at issue here is that the Ordinance here applies within 100 feet of places of worship and schools as well as health care facilities, ECF No. 20-2 at 27–28, whereas the ordinance in *Hill* only applied within 100 feet of health care facilities, *Hill* 530 U.S. at 707.

claimed that the ordinance violated their right to free speech under the First Amendment. *Id.* at 708. The Court found the ordinance to be content neutral for three reasons. *Id.* at 719–20. First, "it [was] not a 'regulation of speech,'" but rather "a regulation of the places where some speech may occur." *Id.* at 719. Second, the restriction of speech "was not adopted because of disagreement with the message it conveys," as it "appl[ied] equally to all demonstrators, regardless of viewpoint" or content. *Id.* "Third, the State's interests in protecting access and privacy" are unrelated to the content of the regulated speech. *Id.* at 720. In short, the Court found that the ordinance "places no restrictions on—and clearly does not prohibit—either a particular viewpoint or any subject matter that may be discussed by a speaker. Rather, it simply establishes a minor place restriction on an extremely broad category of communications with unwilling listeners." *Id.* at 723.

*Hill*'s content neutrality analysis is directly on-point here. Like the ordinance in *Hill*, the Ordinance here does not regulate speech based on the topics, ideas, or viewpoints expressed. Rather, it applies to all leafleting, all signage, and all oral protest, education, and counseling equally. The Ordinance regulates these broad categories of speech regardless of the subject matter of signs or the political leanings of oral protestors. Without any mention of viewpoints or the subject matter of the communications, the Ordinance cannot be said to "draw[] distinctions based on the message a speaker conveys." *Reed*, 576 U.S. at 163; *Hill* 530 U.S. at 720 ("As we have repeatedly explained, government regulation of expressive activity is 'content neutral' if it is justified without reference to the content of regulated speech.").

The Court in *Hill* also rejected the argument that the ordinance was content based because the content of the speech "must sometimes be examined" to determine whether it is covered by the ordinance at all. 530 U.S. at 720. The Court reasoned that it is not "improper to look at the content of an oral or written statement in order to determine

whether a rule of law applies to a course of conduct." *Id.* at 721. And it is unlikely that there would often be a need to examine speech closely to determine whether it was "oral protest, education, or counseling" rather than innocuous conversation. *Id.* at 721. Even if such a need did arise, "the kind of cursory examination that might be required to exclude casual conversation from the coverage of a regulation of picketing" would not be problematic. *Id.* at 722. The same reasoning applies to the Ordinance here, which requires a cursory examination of speech to determine whether people are leafleting, displaying signs, or orally protesting. Such an examination does not make the Ordinance a content based regulation.

The Supreme Court's other jurisprudence in this sphere supports a finding that the Ordinance is content neutral. For instance, in *Heffron v. International Society for Krishna Consciousness, Inc.*, 452 U.S. 640, 643–44 (1981), the Court considered a religious society's challenge of a rule that required all sales, exhibitions, or distributions of materials at a fair to take place "only from fixed locations on the fairgrounds." The Court held that the rule was content neutral because it "applie[d] evenhandedly to all who wish to distribute and sell written materials or to solicit funds." *Id.* at 648–49. Similarly, the Ordinance here applies evenhandedly to all who wish to handbill, display signs, or engage in oral protest or counseling. *See Frisby v. Schultz*, 487 U.S. 474, 477 (1988) (accepting lower courts' conclusion that complete ban on picketing in residential areas, regardless of the underlying subject matter, was content neutral).

Plaintiff argues that the Supreme Court's decision in *Reed* cautions against expanding *Hill*'s analysis. ECF No. 24 at 10–12. There, the Court considered a sign code that subjected "'Temporary Directional Signs Relating to a Qualifying Event,' loosely defined as signs directing the public to a meeting of a nonprofit group," to more stringent restrictions than other signs, such as "Ideological Signs" and "Political Signs." 576 U.S. at 159–61. The Court found that the sign code was clearly "content based on its

face." *Id.* at 164.  The code defined each type of sign differently, differentiating between signs that directed the public to church ("Temporary Directional Signs Relating to a Qualifying Event"), were designed to influence elections ("Political Signs"), or communicated any other messages or ideas ("Ideological Signs"), and then "subject[ed] each of these categories to different restrictions." *Id.*  Simply put, the code's restrictions "depend[ed] entirely on the communicative content of the sign." *Id.*  Unlike the code in *Reed*, the Ordinance here does not depend on the *communicative content* of the speech, but rather the broad type of speech at issue.  Rather than distinguishing between speech supporting nonprofits, speech about politics, and speech about abortion rights, the Ordinance merely distinguishes between leafleting and casual conversation, for instance, without regard to the subject matter of the speech.  *Reed* does not alter *Hill*'s application to the Ordinance; if anything, *Reed* reinforces *Hill*'s application to the Ordinance.

The above readings of *Hill* and *Reed* also defeat Plaintiff's argument that the only way to square the two cases is to accept that health care facilities involve "special sensitivities," and thus the constitutional principles in *Hill* were unique and not applicable to other contexts.  ECF No. 24 at 11.  While the ordinance in *Hill* applied equally to all speech regardless of content and only distinguished between "extremely broad categor[ies] of communications," 530 U.S. at 723, the sign code in *Reed* clearly distinguished based on the content of the speech on its face, 576 U.S. at 164.  It is therefore easy to square the two cases without any mention of the regulated locations.

Plaintiff also cites to *Burson v. Freeman*, 504 U.S. 191 (1992), but that case is of no help to him.  There, the Supreme Court considered a code which prohibited solicitation of votes or the display of campaign materials within 100 feet of the entrance to a polling place.  *Id.* at 193.  The Court found the code to be content based because it was "a prohibition of public discussion of an entire topic"—political campaigns.  *Id.* at 197.  Plaintiff cherry picks the following language from the opinion: "distinguishing

among types of speech requires that the statute be subject to strict scrutiny." *Id.* at 207. But the "types of speech" the Court was referring to were different subject matters: speech regarding political campaigns versus speech about any other subject matter. *See id.* at 197. This reasoning also falls in line with *Hill* and *Reed*, as it prohibits distinctions based on communicative content. *Burson* therefore does not change the outcome here.

Tellingly, the Ninth Circuit recently endorsed this reading of the Supreme Court's content neutrality precedents in *Project Veritas v. Schmidt*, 125 F.4th 929 (9th Cir. 2025). There, the court considered a First Amendment challenge to an Oregon law prohibiting the recording of oral conversations without the knowledge of all participants. *Id.* at 937. Plaintiff, who frequently violated the law while engaged in undercover journalism, believed that announcing the recording of a conversation would cause individuals to refuse to talk or talk with less candor. *Id.* The law included carve-outs for recordings during felonies and recordings of conversations in which a law enforcement officer is a participant. *Id.* at 938–39. Plaintiff argued that these exceptions rendered the law "content based because one must examine the content of an unannounced recording to determine whether it is lawful or unlawful." *Id.* at 949. The court, however, noted that the principal inquiry "is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Project Veritas*, 125 F.4th at 947 (quoting *Hill*, 530 U.S. at 719). The court then explained that the Supreme Court in *Hill* did not find it "improper to look at the content of an oral or written statement in order to determine whether a rule of law applies to a course of conduct." *Id.* (quoting *Hill*, 530 U.S. at 721–22); *see also City of Austin*, 596 U.S. at 72 ("restrictions on speech may require some evaluation of the speech and nonetheless remain content neutral").

With these principles in mind, the Ninth Circuit found Oregon's recording law to be content neutral. *Project Veritas*, 125 F.4th at 950. Regarding the law enforcement exception in particular, the court reasoned that the law applies "regardless of what the

14

conversation is about" and "draws a line based on the circumstances in which a recording is made, not on the content of the conversation recorded." *Id.* at 951–52. The exception "applies evenhandedly … regardless of the subject matter of the conversation." *Id.* at 952 (quoting *Heffron*, 452 U.S. at 649; citing *Hill*, 530 U.S. at 722–23). Oregon did not seek to "proscrib[e] speech … because of disapproval of the ideas expressed," or "based on hostility—or favoritism—towards the underlying message[.]" *Id.* (internal citation omitted). The Ninth Circuit's recent acceptance of *Hill*'s analysis reinforces the Court's finding here.

Lastly, Plaintiff argues that, with the Ordinance, the City is "inverting" the First Amendment "hierarchy" by subjecting "the most protected categories of speech"—leafleting, oral protest, signage—to more stringent restrictions than more casual speech, which is not covered by the Ordinance. ECF No. 24 at 12–13. In making this argument, Plaintiff alludes to the commercial speech doctrine, which affords less constitutional protection to commercial speech than non-commercial speech. *Id.* at 12.

In the context of the content neutrality analysis, this argument is little more than a red herring. Whether a speech restriction is content neutral has nothing to do with the relative degree of protection that the Constitution affords different categories of speech. For example, in *Frisby*, the Supreme Court found an outright ban on picketing in residential areas to be content neutral, notwithstanding the fact that the ordinance restricted picketing—a quintessential First Amendment activity—but not casual neighborhood conversations. 487 U.S. at 480. This makes sense, after all, as the City is seeking to limit harassment and disruptive speech activities, which is unlikely to spawn from casual conversation. *See Hill*, 530 U.S. at 724 ("[t]he statutory phrases, 'oral protest, education, or counseling' distinguish speech activities likely" to constitute harassment or be a nuisance from speech that is "most unlikely to have those consequences"). Because the Supreme Court's teachings confirm that the City may

implement content neutral time, place, and manner regulations on protected speech, so long as the regulation is reasonable, Plaintiff's argument fails. *See id.* at 722 ("we have never suggested that the kind of cursory examination that might be required to exclude casual conversation from the coverage of a regulation of picketing would be problematic").

Accordingly, the Court finds the Ordinance to be a content neutral regulation on speech which triggers intermediate scrutiny.

### B. Time, Place, or Manner Restriction

Having found the Ordinance to be content neutral, the Court must now determine whether the Ordinance survives intermediate scrutiny. The City contends that it has a significant interest in protecting students entering and exiting schools, that the Ordinance is narrowly tailored to serve that interest, and that the Ordinance leaves open ample alternative channels for communication. ECF No. 20-1 at 11–17. Plaintiff contests each of these arguments, while also arguing that the City's staff report on the Ordinance, *see* ECF No. 20-2 at 49–54, cannot support the City's arguments here. ECF No. 24 at 13–22.

### i. Significant Governmental Interest

The City asserts that the Ordinance's purpose is to "protect[] the rights of those who seek access to … educational services" by forbidding "intentional efforts to harass or prevent a person from exercising these rights[.]" ECF No. 20-2 at 24. Specifically, the Ordinance "ensure[s] students can attend school free from harassment, obstruction, or intimidation," a goal which is supported by the evidence presented in the staff report. ECF No. 20-1 at 12–13. The parties dispute whether students are a vulnerable population such that the City has a legitimate interest in protecting them as they enter and exit school grounds. ECF No. 20-1 at 11–14; ECF No. 24 at 13–15.

Here, the City again relies on the Supreme Court's decision in *Hill*. There, the Court noted that "[s]tates and municipalities plainly have a substantial interest in

controlling the activity around certain public and private places," including "schools, courthouses, polling places, and private homes." *Id.* at 728-29. Further supporting the City's interest in regulating speech near schools is *Grayned v. City of Rockford*, 408 U.S. 104, 118 (1972), where the Court found a significant governmental interest in restricting speech that "materially disrupts classwork or involves substantial disorder or invasion of the rights of others." *Id.* at 118 (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 513 (1969)). This is because "public schools in a community are important institutions" which "could hardly tolerate boisterous demonstrators who . . . block entrances[.]" *Id.* at 118-19. The city thus had a "compelling interest in having an undisrupted school session conducive to the students' learning[.]" *Id.* at 119. This is precisely the same interest the City purports to have here: protecting students near schools from "harassment, obstruction, or intimidation." ECF No. 20-1 at 12; *see also* ECF No. 20-2 at 24. Therefore, the Supreme Court's precedent supports a finding that the City's asserted interest in controlling activity around schools is important.

Lower courts have consistently applied the Supreme Court's precedent to find similar interests to be significant. *See Jacobs v. Clark Cnty. Sch. Dist.*, 526 F.3d 419, 435–36 (9th Cir. 2008) ("it is hard to think of a government interest more important than the interest in fostering a conducive learning environment for our nation's children"); *PETA v. Rasmussen*, 298 F.3d 1198 (10th Cir. 2002) ("hold[ing] that there is a significant government interest in preventing disruptions to classes or substantial order," even immediately after school); *Rothner v. City of Chicago*, 929 F.2d 297, 303 (7th Cir. 1991) ("Government has few interests more compelling than its interest in insuring that children receive an adequate education"); *Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 38 (10th Cir. 2013) (noting the "special characteristics of the school environment, where the government has a compelling interest in protecting the educational mission of the school and ensuring student safety") (cleaned up); *Klein v. City of Laguna Beach*, 594 F. Supp.

17

2d 1142, 1145 (C.D. Cal. 2009) (finding amplified sound buffer around school to be narrowly tailored to "the City's important interests in maintaining a productive learning environment, tranquility, and, most importantly, safety"); *Morgan v. Plano Indep. Sch. Dist.*, 589 F.3d 740, 747 (5th Cir. 2009) (acknowledging school district's interest in "providing a focused learning environment for its students"); *Slotterback By & Through Slotterback v. Interboro Sch. Dist.*, 766 F. Supp. 280, 299 (E.D. Pa. 1991) ("[e]nsuring the safety of persons on public property and preventing the disruption of education at public schools are significant government interests"); *see also New Jersey v. T.L.O.*, 469 U.S. 325, 340 (1985) ("maintaining security and order in the schools requires a certain degree of flexibility in school disciplinary procedures").

Plaintiff argues that while the City may have an interest in regulating speech that disrupts schools, it does not have an interest in protecting "vulnerable" students themselves from harassment or distractions. ECF No. 24 at 13–14. Plaintiff's argument ignores the fact that safeguarding schools from disruption goes hand-in-hand with protecting the students from the activity likely to cause disruption, particularly if it might involve harassment or other inappropriate behavior near school grounds.

Several cases illustrate this point. The Seventh Circuit, in reviewing an ordinance that prohibited minors from playing video games during school hours, stated that the "[g]overnment has few interests more compelling than its interest in insuring that children receive an adequate education." *Rothner*, 929 F.2d at 303. *Rothner* shows that protecting children from disruptions—in that case, video games—is tantamount to maintaining an effective educational environment. *See also Taylor*, 713 F.3d at 38 ("the government has a compelling interest in protecting the educational mission of the school *and ensuring student safety*") (emphasis added) (citing *Morse v. Frederick*, 551 U.S. 393, 406–07 (2007); *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986); *New*

18

24-cv-02211-GPC-DDL

*Jersey v. T.L.O.*, 469 U.S. 325, 340 (1985)).  The Ninth Circuit has also highlighted the importance of protecting children from distractions near school grounds:

> We are mindful that this case involves a special circumstance, the presence of children.  In particular, the evidence suggests that children were distracted by the Plaintiffs' pictures, and this distraction perhaps posed a danger as students crossed the streets around the school.  Children may well be particularly susceptible to distraction or emotion in the face of controversial speech, and may not always be expected to react responsibly.

*Ctr. for Bio-Ethical Reform, Inc. v. L.A. Cnty. Sheriff Dep't*, 533 F.3d 780, 790 (9th Cir. 2008), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009);[3] *see also Bering v. SHARE*, 721 P.2d 918, 935 (Wash. 1986) (en banc) (finding that the state "has a compelling interest in avoiding subjection of children to the physical and psychological abuse inflicted by the picketers'" offensive speech).  In all, decades of case law shows that the City's interest in protecting children and, by extension, schools, from harassment, obstruction, or intimidation are intertwined.

Plaintiff also asserts that *Grayned*, *Hill*, and *Tinker* do not acknowledge "a governmental interest in shielding purportedly 'vulnerable' students from protected expressive activity peacefully and quietly taking place *outside* the school grounds, much less when school is out of session."  *Id.* at 15 (emphasis in original).  On this point, *PETA v. Rasmussen*, 298 F.3d at 1198, is instructive.  There, the Tenth Circuit considered a statute that prohibited conduct near schools that interfered with or disrupted students or school activities, and, more specifically, the statute's application to peaceful protests that took place across the street from a junior high school both at lunch time and shortly before classes ended.  *Id.* at 1201–02.  The court relied on *Tinker* and *Grayned* but noted

---

[3] While the Ninth Circuit in *Center for Bio-Ethical Reform* discussed "the presence of children" in the context of a heckler's veto analysis, and not in the context of whether the government had a significant interest in an intermediate scrutiny analysis, its discussion of the importance of protecting children from distractions near school grounds is still relevant here.

that "*Grayned* did not explicitly find a significant governmental interest after school hours and did not define 'normal school activities.'" *Id.* at 1205.  Nonetheless, the court found "that disruptions immediately after school can affect the school's learning environment and that leaving school can properly be considered a 'normal school activity' for a junior high school." *Id.*  The Court agrees with this interpretation of *Grayned*, and thus finds that the City has an interest in protecting students from potentially disruptive speech near school grounds, even outside of school hours.  *See id.* at 1202 ("[t]he protests were not noisy, but some students allegedly were distracted, stayed late, missed their rides, or sought to interact with the protesters"); *see also Klein*, 594 F. Supp. 2d at 1145 (finding that, in implementing sound ordinance near high school, the city had an important interest in "maintaining a productive learning environment, tranquility, and, most importantly, safety," especially because plaintiff "would engage in his activities 'at the moment the school dismisses its students'").

Accordingly, the Court finds that "ensur[ing] students can attend school free from harassment, obstruction, or intimidation" is a significant government interest.  *See* ECF No. 20-1 at 12.[4]

### ii.  Narrow Tailoring

The Court must next determine whether the Ordinance is narrowly tailored to serve the City's interests in protecting students leaving school from harassment, obstruction, or intimidation.  "For a content-neutral time, place, or manner restriction to be narrowly tailored, it must not 'burden substantially more speech than is necessary to further the

---

[4] Plaintiff briefly takes issue with the Court's previous characterization of individuals coming and going from places of worship as "vulnerable."  *See* ECF No. 24 at 14 n.5.  The Ninth Circuit has found that protecting those "engaging in worship from harassment or intimidation" and "ensuring access to … places of worship" are legitimate government interests in a case involving a floating buffer zone around places of worship.  *Edwards v. City of Santa Barbara*, 150 F.3d 1213, 1216 (9th Cir. 1998) (citing *Schenck v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357, 376 (1997)).

1   government's legitimate interests.'" *McCullen*, 573 U.S. at 486 (quoting *Ward*, 491 U.S.

2   at 799). The regulation need not be the least restrictive means of serving the

3   government's interests, but the government "may not regulate expression in such a

4   manner that a substantial portion of the burden on speech does not serve to advance its

5   goals. *Id.* (quoting *Ward*, 491 U.S. at 798–99).

6       Plaintiff's chief argument is that the City did not consider sufficient evidence

7   demonstrating that the Ordinance advances its interests in protecting students leaving

8   school from harassment, obstruction, or intimidation. ECF No. 24 at 17–21. Plaintiff

9   argues that there have not been any instances in San Diego where demonstrators have

10  engaged in the kind of aggressive and disruptive activity the City is concerned about, and

11  that the City does not provide adequate findings that such activity is forthcoming. ECF

12  No. 24 at 17–21. The City responds (1) that it relied on its own experience, the City

13  Attorney's staff report, and the experience of other jurisdictions, ECF No. 20-1 at 12–13;

14  (2) that it relied on "history, consensus, and simple common sense," *id.* at 13 (quoting

15  *Renton v. Playtime Theaters, Inc.*, 475 U.S. 41, 51 (1986)); and (3) that it did not need to

16  wait for disturbances to occur before enacting the Ordinance, *id.* at 13–14. Accordingly,

17  the question is whether sufficient evidence supports the City's enactment of the

18  Ordinance.

19       "The First Amendment does not require a city, before enacting such an ordinance,

20  to conduct new studies or produce evidence independent of that already generated by

21  other cities, so long as whatever evidence the city relies upon is reasonably believed to be

22  relevant to the problem that the city addresses." *Renton*, 475 U.S. at 51–52; *see Gammoh*

23  *v. City of La Habra*, 395 F.3d 1114, 1127 (9th Cir. 2005) ("No precedent requires the

24  City to obtain research targeting the exact activity that it wishes to regulate: the City is

25  only required to rely on evidence 'reasonably believed to be relevant' to the problem

26  being addressed.") (quoting *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425,

27

28

438 (2002)).  While courts "generally defer to the legislative body passing the law in determining whether the government's ends are advanced by a regulation," *G.K. Ltd. Travel v. City of Lake Oswego*, 436 F.3d 1064, 1073 (9th Cir. 2006), "[t]his is not to say that a municipality can get away with shoddy data or reasoning."  *Alameda Books*, 535 U.S. at 438.  If a plaintiff fails to cast doubt on a city's rationale, "either by demonstrating that the municipality's evidence does not support its rationale or by furnishing evidence that disputes the municipality's factual findings," the city meets *Renton*'s standard.  *Id.* at 438–39.  But if a plaintiff does cast doubt on the city's rationale, "the burden shifts back to the municipality to supplement the record with evidence renewing support for a theory that justifies its ordinance."  *Id.* at 39.

Here, the Ordinance states that "demonstration activities around Covered Facilities have subjected students, teachers, [and] parents . . . to harassment and abuse from people who attempt to block entrances and exits to Covered Facilities and parking lots used to access these locations."  ECF No. 20-2 at 23.  The Ordinance further states that "aggressive demonstration activities pose significant public safety threats" and that "places of worship and schools are increasingly exposed to demonstration activities."  *Id.* In support of these findings, the legislature considered the City Attorney's staff report on the Ordinance.  *See id.* at 49–54.  The staff report cited a Governor Newsom press release regarding an authorization of $30 million in funding to protect places of worship from "violent attacks and hate crimes."[5]  The staff report also notes that "[e]lementary, middle, and high schools have become assembly places for people to express positions on LGBTQ+ issues in schools, among others, and given proposed budget cuts statewide, further demonstration activity is anticipated."  *Id.*  In support of this, the report cited

---

[5] *Governor Newsom Doubles Funding to Bolster Safety and Security in Faith Communities and Takes Action to Immediately Increase Police Presence at Places of Worship*, GOVERNOR GAVIN NEWSOM (Oct. 18, 2023), https://www.gov.ca.gov/2023/10/18/faith-security-funding/.

recent protests regarding LGBTQ+ issues at school facilities in southern California. *Id.* at 52 n.3. The report further mentioned a disruptive protest that led the Poway school district's board of directors to adjourn a public meeting. *Id.* at 52. Lastly, the report described a San Diego school board member's testimony to the City Council's Public Safety Committee regarding "multiple instances of anti-vaccine protestors blocking school operations during the pandemic." *Id.*

A close examination of the proffered evidence, however, raises doubts as to whether the evidence is "reasonably believed to be relevant to" the City's purported interest in protecting students from harassment, obstruction, and intimidation near schools. The Ordinance seeks to restrict individuals from passing leaflets and handbills; displaying signs; and engaging in oral protest, education, or counseling near schools, FAC ¶ 26, and Plaintiff specifically intends on passing leaflets near schools, *id.* ¶¶ 4, 27–30. But the City's evidence does not support a finding that the Ordinance, by restricting Plaintiff's leafleting activities, will further its interests.

To start, Governor Newsom's authorization of funds to protect places of worship has nothing to do with speech at schools, so it is entirely irrelevant. And Plaintiff vehemently disputes whether San Diego school board member's testimony "cite[d] any instances of particular demonstrations." Because the Court is not considering the factual assertions in the staff report as true, the Court will resolve this factual dispute in Plaintiff's favor at this stage. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1014 (9th Cir. 2018) ("courts must interpret the allegations and factual disputes in favor of the plaintiff at the pleading stage"). Accordingly, neither of these pieces of evidence support the City's justification for the Ordinance.

As such, the only relevant evidence that the City considered in passing the Ordinance are the recent school protests cited in the staff report. The report cites a brawl between protestors at the Glendale Unified School District Headquarters, where police

officers had to separate protestors who had opposing views on the district's recognition of June as Pride Month.[6]  The report also cited a peaceful high school walkout in Temecula regarding a school district's anti-LGBTQ policies.[7]  And the report cited a disruptive protest that led the Poway school district's board of directors to adjourn a public meeting.[8]  While this evidence generally shows that schools are increasingly forums for First Amendment activity, notably, none of it deals with leafleting or one-on-one conversations.  And only one of these examples—the peaceful school walkout—even took place at an actual school.[9]  Therefore, the evidence is not reasonably relevant to whether a restriction on leafleting or one-on-one oral protest near schools would further the City's interests in protecting students from disruption.

In addition to the weak connection between the evidence and the restrictions the City is imposing on Plaintiff's intended activities, it is important to note what the City did not present.  In cases where cities have met the *Renton* standard, they have relied on some robust combination of studies, public comments, extensive deliberation, or other city's findings as to whether a law furthers a city's stated goals.  *See, e.g., Renton*, 475 U.S. at 50–52 (finding sufficient evidence where the city relied on very detailed studies produced

---

[6] *Protesters brawl as Southern California school district decides whether to recognize Pride Month*, ASSOCIATED PRESS (June 6, 2023), https://apnews.com/article/glendale-school-district-pride-month-protests-fighting-adcb1e4f9051256a4f35fb3174137229.

[7] Rob McMillan, *High school students in Temecula stage walkout over alleged anti-LGBTQ policies*, KABC TELEVISION, LLC (Sept. 22, 2023), https://abc7.com/temecula-high-school-lgbtq-protest/13816822/.

[8] Elizabeth Marie Himchak, *Protestors disrupt Poway Unified board meeting, cause its adjournment*, THE SAN DIEGO UNION-TRIBUNE (October 11, 2021), https://www.sandiegouniontribune.com/2021/09/09/protesters-disrupt-poway-unified-board-meeting-cause-its-adjournment/.

[9] The others took place at school district buildings or other administrative locations.  *See infra* notes 6 & 8.  While it is not clear to the Court whether these are Covered Facilities under the Ordinance, *see* ECF No. 20-2 at 26–27, it makes little difference here because Plaintiff only intends to engage in his activities at schools, FAC ¶ 27–29.

by the city of Seattle, as well as testimony heard by the Washington Supreme Court, in a case challenging a similar Seattle ordinance); *Alameda Books*, 535 U.S. at 435, 439 (finding sufficient evidence where the city relied on a study that showed a direct connection between the ordinance and its justification for the ordinance); *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 558–61 (2001) (detailing numerous FDA studies and "ample documentation of the problem with underage use of smokeless tobacco and cigars"); *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 626–29 (1995) (detailing 106-page summary of two-year study, and commenting on the "breadth and detail" of the anecdotal record in support of the bar's justifications for regulating direct-mail solicitation); *G.K. Ltd. Travel*, 436 F.3d at 1015 (finding that the city's sign code "was the result of much legislative deliberation, a dynamic dialogue with the City's residents and businesses and extensive hearings," and that the city relied on these conversations and "the experience of other cities, [which] produced strong evidence of the need for" the sign code); *Gammoh*, 395 F.3d at 1126 (finding sufficient evidence where the city council considered 17 studies, multiple reports, declarations, interviews, and numerous judicial decisions). Here, however, the City did not rely on any other city's findings or any studies or reports that provide support for the Ordinance's justification. Based on the record before the Court, it appears that the City's justification for enacting the Ordinance is based on little more than "mere conjecture," "hypotheticals," and "vague allusions to practical experience" regarding the need to restrict leafleting and one-on-one conversations near schools. *Porter v. Gore*, 354 F. Supp. 3d 1162, 1178 (S.D. Cal. 2018) (Curiel, J.) (quoting *Citizens for Clean Gov't v. City of San Diego*, 474 F.3d 647, 653–54 (9th Cir. 2007); *see also id.* (denying motion to dismiss plaintiff's First Amendment challenge to regulation of vehicle horns where the record contained little evidence of the state's justification for the regulation).

Accordingly, the Court finds that Plaintiff sufficiently casts doubt on the City's rationale in enacting the Ordinance. At the motion to dismiss stage, this is sufficient to find that, based on the current record, the Ordinance is not narrowly tailored to serve the City's interests in protecting students leaving schools from harassment, obstruction, and intimidation. *See Duncan v. Becerra*, 265 F. Supp. 3d 1106, 1121 (S.D. Cal. 2017) ("It may well be that on a more robust evidentiary showing, made after greater time and testimony is taken, that the State will be able to establish a reasonable fit. But not yet.")

### iii.  Alternative Channels for Communication

While the Court's finding that the Ordinance is not narrowly tailored is fatal to the City's motion to dismiss the as-applied free speech claim, the Court will still address the alternative channels for communication. Plaintiff alleges that "[o]btaining consent is an unrealistic requirement for distributing literature to multiple people arriving in waves and leaves Plaintiff unable to engage in the critical literature distribution aspect of his free speech activity." FAC ¶ 30. Because "[t]here is no communicative equivalent to handing out literature," Plaintiff claims that the Ordinance fails to provide any alternative channels of communication. ECF No. 24 at 21.

Even taking Plaintiff's allegations as true, the Supreme Court foreclosed this argument in *Hill*. There, the Supreme Court found ample alternative channels of communication when dealing with a substantially similar ordinance. 530 U.S. at 726–27. The Court reasoned that the ordinance might in fact aid the readability of signs and that the eight-foot buffer zone allows oral protestors to engage at a "normal communication distance." *Id.* While the Court did acknowledge a "more serious" impact on leafleting, as Plaintiff alleges, it still reasoned that the ordinance does not "prevent a leafletter from simply standing near the path of oncoming pedestrians and proffering his or her material, which the pedestrians can easily accept." *Id.* at 727.

The reasoning in *Hill* leads the Court here to similarly conclude that there are ample alternative channels for Plaintiff to communicate his message.  The Ordinance does not hinder the readability of signs and oral communication, nor does it prevent Plaintiff from standing in students' paths and distributing leaflets to willing recipients. *Id.* at 726–27.  Therefore, even accepting Plaintiff's allegations regarding the impracticability of leafleting in his preferred manner under the Ordinance, the Court finds that he still has ample alternatives for communicating his message to students near schools without disrupting unwilling listeners.  *See Edwards v. City of Santa Barbara*, 150 F.3d 1213, 1217 (9th Cir. 1998) (finding that driveway buffer zone at health care facilities "permits ample alternative avenues of communication[] by placing no limit on speech or expressive activity outside a narrow zone").  After all, "an alternative channel need not be ideal, but merely adequate." *Project Veritas*, 125 F.4th at 957 (citing *Heffron*, 452 U.S. at 654–55).  Because the Ordinance does not "eliminate[] the only method of communication by which [Plaintiff] can convey [his] message to a particular audience," and in fact leaves open ample alternative methods, Plaintiff's argument fails. *Id.* (citing *Bay Area Peace Navy v. United States*, 914 F.2d 1224, 1229–30 (9th Cir. 1990)).[10]

Accordingly, the Court finds that the Ordinance provides ample alternative channels of communication.  However, because Plaintiff has sufficiently alleged that the Ordinance is not narrowly tailored, the Court finds that the Ordinance is not a reasonable

---

[10] While Plaintiff alleges that obtaining consent from students near school exits when classes end for the day is an "unrealistic requirement," the Court notes that the alleged difficulties are largely due to the time and place of Plaintiff's activities, and not the Ordinance itself.  Irrespective of the consent requirement, it is difficult to attract students' attention as they leave a crowded school from the same exits at the same time.

time, place, and manner restriction.  Therefore, the Court DENIES the City's motion to dismiss Plaintiff's as-applied free speech claim.

## III.   Facial Free Speech Challenge

Generally, "a plaintiff cannot succeed on a facial challenge unless he establishes that no set of circumstances exists under which the law would be valid, or he shows that the law lacks a plainly legitimate sweep." *Moody*, 603 U.S. at 723.  In the First Amendment context, however, the Supreme Court has employed a less-demanding, though still rigorous, standard for facial challenges.  *Id.*  "The question is whether a substantial number of the law's applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Id.* (internal quotation marks, citation, and brackets omitted).

This inquiry has two parts.  First, the Court must "assess the state laws' scope" and ask: "What activities, by what actors, do the laws prohibit or otherwise regulate?" *Id.* at 724.  Second, the Court must "decide which of the laws' applications violate the First Amendment, and to measure them against the rest." *Id.* at 725.  In the end, the challenging party has the burden to show that the law "prohibits a substantial amount of protected speech relative to its plainly legitimate sweep." *Id.* at 744; *see also Project Veritas*, 125 F.4th at 961 ("[t]he party asserting substantial overbreadth bears the burden of establishing it").[11]

First, the Court decides what the Ordinance's scope is. *Moody*, 603 U.S. at 724. This step is simple.  The Ordinance requires one to obtain consent before coming within eight feet of an individual to pass leaflets, display signs, or engage in oral protest,

---

[11] The parties' briefing focuses on more general overbreadth arguments. *See* ECF No. 20-1 at 17–18; ECF No. 24 at 24.  However, as the Ninth Circuit has recognized, "the test described here applies to both First Amendment facial challenges and overbreadth challenges." *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1115 n.6 (9th Cir. 2024).

education, or counseling within 100 feet of health care facilities, places of worship, or schools.

"The next order of business is to decide which of the law['s] applications violate the First Amendment, and to measure them against the rest." *Id.* at 725.  However, much like in *Project Veritas*, 125 F.4th at 961, Plaintiff fails to carry his burden here because his arguments almost exclusively focus on his own intended speech activities.  While Plaintiff argues that the Ordinance is unlawful as applied to his intended activities near schools, "these applications represent only a sliver of the conversations to which [the Ordinance] may apply." *Id.*  To be sure, Plaintiff does briefly contend that the Ordinance "applies to hundreds of 'Covered Facilities,'" and suggests in passing that the Ordinance may unconstitutionally cover students discussing a math assignment with other students, or even parents, teachers, or staff.[12]  ECF No. 24 at 24.  But even assuming these speakers would meet the Ordinance's scienter requirement, Plaintiff still "makes little effort to identify and weigh the [Ordinance's] lawful and unlawful applications[.]" *Project Veritas*, 125 F.4th at 961.  The lack of any analysis of the Ordinance's applications dooms Plaintiff's facial challenge.

Therefore, Plaintiff's claim that the Ordinance violates the First Amendment on its face fails.

## IV.  Vagueness

Plaintiff alleges that the Ordinance is an "unconstitutionally vague restriction on expressive activity."  FAC ¶¶ 34, 36.  Plaintiff specifically challenges § 52.003(c) of the

---

[12] Though it is not vital to the Court's reasoning here, it is worth noting that the Ordinance provides an exemption for "employees, agents, or volunteers of the … school or school district operating on *school grounds* acting within the scope of their employment, agency, or volunteer service."  ECF No. 20-2 at 28.  Thus, the Ordinance would not cover a student discussing their homework with a teacher on school grounds, as Plaintiff has suggested in his briefing and at the hearing on the motion.

Ordinance (the "consent provision"), ECF No. 20-2 at 27–28, because the words "protest," "education," and "counseling" are vague.  ECF No. 24 at 23.

"A statute can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits.  Second, if it authorizes or even encourages arbitrary and discriminatory enforcement."  *Hill*, 530 U.S. at 732.

On the first point, the Ordinance's scienter requirement ameliorates any vagueness concerns, as the Supreme Court found in *Hill*.  *Id.*  The Ordinance here, much like the ordinance in *Hill*, requires "knowing" and "willful" unconsented approaches "for the purpose of "engaging in oral protest, education, or counseling."  *Compare* ECF No. 20-2 at 27–28 *with Hill*, 530 U.S. at 732.  "The likelihood that anyone would not understand any of those common words seems quite remote."  *Hill*, 530 U.S. at 732.

Plaintiff offers hypothetical scenarios to show where confusion can arise as to what conduct the Ordinance prohibits.  For instance, a student might be "protesting" by stating that a teacher should have given her extra credit, or a parent dropping their child off at school might be "counseling" their child by advising them to study hard.  The confusion surrounding these scenarios, in Plaintiff's eyes, might "hobble" normal social activities near schools.  But, as the Supreme Court recognized in *Hill*, the fact that "imagination can conjure up hypothetical cases in which the meaning of these terms will be in nice question" does not make the Ordinance vague.  *Id.* at 733 (quoting *Am. Commc'ns Ass'n v. Douds*, 339 U.S. 382, 412 (1950)).  In the end, legislators are "[c]ondemned to the use of words," and courts cannot "expect mathematical certainty from our language." *Grayned*, 408 U.S. at 110.  With this in mind, the Court finds that it is sufficiently "clear what the ordinance as a whole prohibits."  *Id.*

Plaintiff also argues that, because the Ordinance can be enforced in numerous random social interactions, the City obviously expects arbitrary and discriminatory

enforcement concentrated towards the speech the City is most concerned about.  But this argument again ignores the Ordinance's scienter requirement.  Law enforcement can only enforce the Ordinance against those who are knowingly and willfully engaging in the unconsented interactions the Ordinance clearly defines.  This would not include potential enforcement against two students chatting while leaving school grounds, not because of selective enforcement, but because the Ordinance does not cover such interactions *at all*.  Like the ordinance in *Hill*, the Ordinance here provides specific definitions and requires the exercise of an acceptable degree of police judgment.  530 U.S. at 733.

Accordingly, the Court finds that the Ordinance is not unconstitutionally vague.

## V.    Leave to Amend

Where a motion to dismiss is granted, "leave to amend should be granted 'unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency.'"  *DeSoto v. Yellow Freight Sys., Inc.,* 957 F.2d 655, 658 (9th Cir. 1992) (quoting *Schreiber Distrib. Co. v. Serv-Well Furniture Co.,* 806 F.2d 1393, 1401 (9th Cir. 1986)).  In other words, where leave to amend would be futile, the Court may deny leave to amend.  *See DeSoto,* 957 F.2d at 658; *Schreiber,* 806 F.2d at 1401.

Here, the Court largely decides the motion to dismiss on strictly legal grounds. The Court therefore finds that amendment would be futile as to the facial overbreadth claim and the vagueness claim because Plaintiff cannot allege any additional facts that would cure the deficiencies in his legal theories.  Accordingly, the Court DENIES Plaintiff leave to amend those claims.

However, Plaintiff's facial free speech challenge can benefit from allegations that show "whether a substantial number of the law's applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."  *Moody*, 603 U.S. at 723.

24-cv-02211-GPC-DDL

Accordingly, the Court GRANTS Plaintiff leave to amend the complaint as to the facial free speech challenge.

## CONCLUSION

For the above reasons, the Court GRANTS the City's motion to dismiss Plaintiff's facial overbreadth and vagueness claims without leave to amend; GRANTS the City's motion to dismiss Plaintiff's facial free speech claim with leave to amend; and DENIES the City's motion to dismiss Plaintiff's as-applied free speech claim.  Plaintiff must file an amended complaint **within 21 days of this Order.**

**IT IS SO ORDERED.**

Dated:  June 2, 2025

Hon. Gonzalo P. Curiel
United States District Judge

24-cv-02211-GPC-DDL